# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of: | ) | |
| Facebook User Identification Numbers 100008149452383 and 100008712457374 | ) ) ) ) ) | Case No. 18 - 842 (NJ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A.

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:

�☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 18, United States Code, Section 922(g)(5), Title 26, United States Code, Section 5861(f).

The application is based on these facts: See attached affidavit.

☑ Delayed notice of _____ days (give exact ending date if more than 30 days: 11/28/2018) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Ryan Arnold, ATF
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: June 1, 2018

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed Name and Title*

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Ryan Arnold, being first duly sworn, hereby depose and state as follows:

## I.   INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application for a search warrant for

information associated with certain Facebook user IDs that are stored at premises

owned, maintained, controlled, or operated by Facebook, a social networking company

headquartered in Menlo Park, California.  The information to be searched is described

in the following paragraphs and in Attachment A.  This affidavit is made in support of

an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and

2703(c)(1)(A) to require Facebook to disclose to the government records and other

information in its possession, pertaining to the subscriber or customer associated with

the user IDs.

2.    It is believed that the information associated with Facebook Username

"Calvin Glazunov," URL: https://www.facebook.com/kalvin.glazunov, Facebook User

ID: 100008149452383 and Facebook Username "Calvin D. Glazunov," Facebook User ID

Number: 100008712457374, URL:

https://www.facebook.com/profile.php?id=100008712457374 may contain evidence of

violations of 18 U.S.C. Section 922(g)(5) (possession of firearm by a prohibited person,

illegal alien) and 26 U.S.C. Section 5861(f) (making a firearm in violation of NFA –

silencer).  As a result, a request is submitted for a search warrant to review information

1

associated with the aforementioned Facebook User IDs. The information to be searched is described in the following paragraphs and in Attachment A.

3.     I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed since April 2015. As an ATF Special Agent, I have participated in numerous investigations regarding the unlawful possession of firearms by prohibited persons. I have also conducted investigations related to the unlawful use of firearms, firearms trafficking, drug trafficking, and arson. In addition, I have also received training on the specifications and licensing requirements of silencers.

4.     Prior to my employment with ATF, I was a Special Agent with the United States Secret Service (USSS) for approximately five (5) years. My duties included providing and planning dignitary protection, drafting and executing Federal search warrants, investigations of organized crime networks, investigations of threats against USSS protectees, fraud networks, counterfeit currency investigations, and other financial crime investigations.

5.     Prior to my employment with the USSS, I served as a police officer with the Chicago, Illinois, Police Department (CPD) for nearly five (5) years. During part of my career as a CPD Officer, I was assigned to the Organized Crime Division-Gang Enforcement Unit. My responsibilities included the investigations of street gangs, narcotics distribution, firearms violations, robbery, home invasions, operating in an undercover capacity, and the authoring and execution of search warrants.

2

6.      Furthermore, I know from my training and experience it is common for firearms traffickers to communicate via cellular phone through a variety of electronic media. It also common for firearm traffickers and prohibited persons to communicate through cellular phones and electronic media to utilize the "grey market." The "grey market" is a term commonly used to describe the procurement of firearms outside of Federal Firearms Licensees (FFLs) where firearms transactions can take place without mandatory background checks. Although some participants in the "grey market" do find ways to validate the legality of the person's ability to possess firearms, it is also common for individuals to bypass a review by the National Instant Criminal Background Check System (NICS). Ultimately, individuals often use social media, websites, and cellular phones to locate potential buyers for firearms and organize a transaction. In turn, this creates a private sale and subsequently does not require the NICS background check. In my training and experience, I know these situations can be exploited by prohibited persons and firearms traffickers. The participants in these schemes can use text (SMS) messaging, phone calls, electronic mail, messaging applications, and various social media applications such as Facebook or Twitter.

7.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other investigators and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3

## II. <u>ITEMS TO BE SEARCHED</u>

8.      The Facebook pages belonging to Calvin Glazunov herein described as a personal website that is accessed with a username and password specific only to that page and further described in Attachment A. The following Facebook Page URL, Facebook Usernames, and associated Facebook Identifications Numbers:

9.      Facebook Username "Calvin Glazunov," URL: https://www.facebook.com/kalvin.glazunov, Facebook User ID: 100008149452383 and Facebook Username "Calvin D. Glazunov," Facebook User ID Number: 100008712457374, URL:  https://www.facebook.com/profile.php?id=100008712457374. The applied-for warrant would authorize the search and recovery of evidence particularly described in Attachment B.

## III. <u>PROBABLE CAUSE</u>

10.     Your Affiant learned of possible violations of 18 U.S.C. § 922(g)(5) (possession of firearm by prohibited person) and 26 U.S.C. Section 5861(f) (making a firearm in violation of NFA –silencer).  Your affiant received information from the Sheboygan, Wisconsin, Police Department that Calvin Glazunov participated in firearm open-carry events, and may be a prohibited person as an illegal alien.  I reviewed information and police reports from local jurisdictions and found the following information, in summary, regarding Glazunov.  In addition, I have relied on such reports in the past and found them to be truthful and reliable.

4

11.     On June 23, 2017, Sheboygan Police Department (SPD) Detective Paul Olsen and Federal Bureau of Investigation (FBI) Special Agent (SA) Michael Meyer traveled to 1611 N. 9th Street, Sheboygan, Wisconsin, and conducted an interview with Calvin D. Glazunov regarding SPD and Sheboygan County Sheriff's Office (SCSO) uniforms possessed by Glazunov. Glazunov invited law enforcement inside the residence and observed police uniforms, airsoft guns with tips painted black, tactical vest, duty belt, handcuffs, and a radio consistent with models carried by police officers. Glazunov advised he purchased the patches online. A nametag was affixed to the SPD uniform for "C. GLAZUNOV," and the SCSO uniform bore a nametag for "A. Dundurs." Glazunov stated that he made the "A. Dundurs" uniform for his girlfriend.

**NICS DENIAL FOR A SHOTGUN**

12.     On or about January 26, 2018, Glazunov was denied the purchase of a firearm by the National Instant Criminal Background Check System (NICS) after attempting to purchase a Mossberg, model 590 Persuader, 12 gauge shotgun, displaying serial number V0587728 from Federal Firearms Licensee (FFL) Blackhawk Shooting Sports located at 24 N. Business Park Drive, Oostburg, Wisconsin. NICS indicated the reason was due to Glazunov's status as an unlawful alien. A review of the ATF NICS Application Field Office Report, NTN 100HPJCN1 revealed that Glasunov was denied on January 29, 2018, and the above firearm was not transferred into his possession (listed denial reason: E- 18 U.S.C. 922 (g)(5) Illegal Unlawful Alien).

5

## PURCHASE OF SMITH & WESSON RIFLE

13.     On February 14, 2018, Glazunov successfully purchased a Smith & Wesson rifle, Model M&P 15-22, bearing serial number DER6104 at FFL Daane Ace Hardware in Oostburg, Wisconsin, after passing a background check.  It should be noted that these checks are not conducted by ATF.

## RIFLE VANDALISM INCIDENT

14.     On March 9, 2018, Fond du Lac County Sheriff's Office (FDLCSO) Deputy Matthew Gradinjan responded to W833 County Highway SS, Auburn, Wisconsin (Zillmer Trail), regarding a vandalism complaint.  The deputy observed that a park bench sustained damage which appeared to be caused by the impact of a .22 caliber bullet.  FDLCSO Deputy Gradinjan also found partial burnt pieces of documents for Glazunov near the scene.

15.     On March 11, 2018, Deputy Gradinjan made telephonic contact with Glazunov regarding the above events.  Glazunov confirmed he owned a Smith & Wesson, .22 caliber, model M&P 15-22 rifle with a camouflage finish, and was present at the above location on March 9, 2018.  Glazunov stated to Deputy Gradinjan that he was shooting the rifle at this location and fired the rounds into the bench.

16.     On March 13, 2018, Mr. Robert Richardson and Glazunov were interviewed by Deputy Gradinjan in the FDLCSO parking lot.  Mr. Richardson confirmed Glazunov was the only person to fire .22 caliber rounds into the park bench.  Glazunov also stated he shot a sign in addition to the park bench.

6

## GLENDALE MALL INCIDENT

17.     On April 6, 2018, Glendale Police Department (GPD) Officer Carrie Doss was dispatched to a call regarding suspicious males at Bayshore Mall located at 5800 N. Bayshore Avenue, Glendale, Wisconsin.  Officer Doss located two males in question; Officer Doss observed the first male wearing tactical clothing, a vest, six loaded rifle magazines (color-coded), a duty belt, and handcuffs.  This male was later identified as Glazuov.  The second male was wearing a trench coat and aviator glasses, and is believed to be Robert Richardson.  Glazunov provided only his first name (Calvin) to the officer.  Glazunov and Mr. Richardson stated they were looking for clients. Mr. Richardson refused to identify himself.

## SHEBOYGAN WALMART INCIDENT

18.     On April 7, 2018, Sheboygan County Sheriff's Office (SCSO) Deputy J.J. Boxrucker responded to a theft complaint at Walmart, 4433 Vanguard Drive, Sheboygan, Wisconsin, 53083.  Also present, but in an off-duty capacity, was Sheboygan Police Department (SPD) Detective Paul Olsen.  Inside the store, Deputy Boxrucker and Detective Olson observed three white males described as follows: Male One wore a tactical vest and camouflage pattern AR style rifle slung over his shoulder; Male Two wore a camouflage hunting jacket and AR type rifle slung over his shoulder; and, Male Three wore aviator glasses and trench coat.  Detective Olson heard one of the individuals make a statement claiming they "we're going to get a rise out of people." The three males approached the uniformed SBSO deputy who was on-scene regarding

7

the theft complaint. Detective Olsen heard one of them ask if there were any policies about carrying their guns in Walmart. All three men wore black patches with a white outline of the state of Wisconsin with two (2) rifles crossed. These men were later identified as follows:

- MALE 1: Calvin D. Glazunov, M/W, DOB: 03/11/1998, 1611 N. 9th St., Sheboygan, Wisconsin 53081;

- MALE 2: Zachary W. Krolow, M/W, DOB: 12/03/1998, 2019 Van Buren St., New Holstein, Wisconsin 53177;

- MALE 3: Robert C. Richardson Jr., M/W, DOB: 08/12/1999, 1111 Ashland Ave., Sheboygan, Wisconsin 53081 (present during incident where the park bench was shot).

19.    On April 7, 2018, the Facebook Page, "Sheboygan Scanner," a civilian page run by people who listen to the Sheboygan police scanner, posted information about a theft at Walmart believed to be regarding the above incident. Another Facebook user replied, "There was just two guys with AR-15 in there too." In response to the aforementioned comment and other comments regarding the men with AR-15s, Facebook Username "Calvin Glazunov" posted the following remarks:

- "That was me open carry, if people have a problem with my 2nd amendment rights, they can suck my big dick."

- "Its funny how everyone looked surprised when the deputies shook our hands and kept escorting us around, and that off duty

8

detective kept trying to take videos, I'm going to get him busted for video taping me without consent."

- "People don't understand that the latest shooting have big occurring in towns were you least expect it. Plus I dont mind open carrying and pissing people off, it made me feel like a king, as everyone darted out."

20.     Affiant reviewed the above posts for Facebook Username "Calvin Glazunov" and performed a Facebook inquiry for "Calvin Glazunov." Affiant observed a Facebook Username "Galvin Glazunov" displaying the same profile picture as the one in the comments above corresponding to Facebook ID # 100008149452383 and URL: https://www.facebook.com/kalvin.glazunov. Affiant also observed a Wisconsin driver's license photograph of Glazunov and believed the photograph matched the person in photographs posted to this Facebook page. In addition, a review of a picture revealed a person believed to be Glazunov holding an object consistent with a Smith & Wesson, M&P .22 caliber rifle as described above.

21.     Affiant observed a second page with the Facebook Username "Calvin D. Glazunov," Facebook ID # 100008712457374, and URL: https://www.facebook.com/profile.php?id=100008712457374&ref=br_rs and observed a photograph consistent with the appearance of Glazunov.

9

## SECOND ZILLMER TRAIL INCIDENT

22.     On April 7, 2018, Game Warden William Mitchell discovered four men with AR-15 style rifles and a shotgun at the Zillmer trail shelter.  The jacket of one of the men displayed a patch that read, "Wisconsin Private Military Group" and explained to Game Warden Mitchell that they had previously used the shelter. The men were not identified, but three vehicles were observed in the area.   Law enforcement was able to query the information for two of the vehicles. A subsequent review of the information revealed one vehicle was registered to Calvin Glazunov.

## SHEBOYGAN OPEN CARRY & VERIFICATION OF RIFLE SERIAL NUMBER

23.     On April 21, 2018, Glazunov attended an open carry march where firearms were displayed and viewable to the public.  During the march, Glazunov provided uniformed SPD Officer Ryan Walloch his rifle to inspect.  SPD Officer Walloch obtained the make, model and serial number of the firearm (Smith & Wesson, Model M&P 15-22, .22 caliber rifle, camouflage finish, displaying S/N: DER6104).  Officer Walloch observed live, .22 caliber ammunition inside the magazines for the rifle. Glazunov advised he loved the camouflage pattern of the rifle so he purchased it from Daane Hardware (Oostburg, Wisconsin) for approximately $550.  The entire meeting between the officer and Glazunov was recorded by SPD body camera.

## INITIATION OF FACEBOOK CONVERSATION WITH ATF UNDERCOVER AGENT

24.     On April 25, 2018, ATF undercover (UC) Special Agent (SA) 726 contacted Glazunov via Facebook messenger at Facebook Username "Calvin Glazunov," URL:

https://www.facebook.com/kalvin.glazunov, Facebook User ID: 100008149452383. UC SA 726 inquired as to the make and model of the rifle Glazunov owned. Glazunov explained he possessed an "M&P 15-22 Krptek Hylander Camouflage" (AR-15 style rifle). UC SA 726 asked Glazunov if he owned any additional firearms. Glazunov responded he did not own any additional firearms, but advised he was focused on upgrading uniforms, vests and kevlar helmets. UC SA 726 requested to purchase the aforementioned AR-15 style rifle from Glazunov. Glazunov responded that he would sell the rifle to UC SA 726 for four hundred and fifty dollars ($450.00). Glazunov explained he needed to purchase a new firearm before he would sell his current one because he always preferred to be armed with a firearm. Glazunov sent UC SA 726 a photograph of the firearm for sale. The firearm is described as an AR-15 style rifle with camouflage finish. Glazunov described this firearm as an "M&P15-22."

25.     Glazunov then, unsolicited, explained to UC SA 726 that he was interested in trying an improvised suppressor (silencer) on the aforementioned rifle. UC SA 726 asked Glazunov if he knew how to make an improvised suppressor. Glazunov explained his "friend" knew how to make one "out of a soda can and some other stuff." Glazunov explained that an improvised suppressor would allow him to shoot the firearm anywhere as long as he (Glazunov) had a bag affixed to the firearm in order to catch the ejected casings. Affiant knows from training and experience that using a suppressor muffles the sound (report), and minimizes the chances of detecting a shooter and the shooter's location. Affiant also knows that removing shell casings from the

11

scene can be a tactic to thwart law enforcement investigations. UC SA 726 asked when Glazunov planned to make the improvised suppressor. Glazunov replied, "Maybe this weekend." SA 726 asked if Glazunov had previously attempted to make an improvised suppressor. Glazunov explained he had not tried to make an improvised suppressor before but was excited to try. Glazunov continued, "IK it's illegal tho" ("IK" is an abbreviation for "I know"). UC SA 726 asked to purchase an improvised suppressor from Glazunov. Glazunov explained that he would need to test the improvised suppressor before recommending them to others. UC SA 726 asked Glazunov how much it would cost to purchase an improvised suppressor, and Glazunov responded that he did not know.

26.     On April 29, 2018, UC SA 726 asked Glazunov via Facebook if he had tried to make the suppressor over the weekend. SA 726 explained he/she wanted to purchase the rifle and suppressor together.

27.     On April 30, 2018, Glazunov responded via Facebook that he did not try to make the improvised suppressor yet. Glazunov explained he did not know how to build one and his "friend" did not "seem so enthusiastic about it." UC SA 726 explained he/she still wanted the firearm and would contact Glazunov again in a few days.

28.     On May 2, 2018, Glazunov Facebook messaged UC SA 726 and asked, "So what's the plan?"

12

29.     On May 4, 2018, Glazunov explained he needed to know by the end of the day and could not wait any longer.  Glazunov explained otherwise he would sell his firearm to the gun store in exchange for the new one. Glazunov later messaged SA 726 and explained he purchased his new "AR-15" but was "delayed."

### REVIEW OF A-FILE BY HOMELAND SECURITY INVESTIGATIONS

30.     Between May 3 and 4, 2018, Homeland Security Investigations (HSI) S.A. Nicholas Doktor reviewed Glazunov's Alien file, (A-File), and stated that Glazunov held "no status" and therefore is prohibited from possessing a firearm.

### SECOND NICS DENIAL

31.     On May 7, 2018, your affiant reviewed ATF Brady Operations Branch, NICS Referral Application Field Office Referral Report regarding a May 4, 2018 attempt to purchase a firearm by GLAZUNOV from FFL Daane Ace Hardware, 936 Center Avenue, Oostburg, Wisconsin (NTN: 100LZGWT).   My review of the report revealed that Glazunov was denied on May 4, 2018, under Denied Number RESP-17709913 pursuant to Prohibited Category E-18 USC 922(g)(5) Illegal Unlawful Alien.

### UNDERCOVER PURCHASE OF RIFLE

32.     On May 7, 2018, UC SA 726 contacted Glazunov regarding the status of the rifle.  Glazunov responded approximately six days later.  Glazunov stated that they had previously communicated on Glazunov's secondary Facebook account; however, he would now contact UC SA 726 from his primary Facebook account.  Subsequently, UC SA 726 received a Facebook Friend Request from Facebook Username "Calvin D.

13

Glazunov," Facebook User ID Number: 100008712457374, URL:

https://www.facebook.com/profile.php?id=100008712457374. Glazunov

communicated with UC SA 726 via this account after the providing the Facebook Friend

Request which UC SA 726 accepted.

33.     On May 15, 2018, Glazunov asked via the above Facebook page if UC SA

726 he wanted to purchase the rifle on that day.  UC SA 726 and Glazunov agreed on a

price of $450 for the rifle.  They agreed to meet at 5:00 p.m. on the street at 1315 N. 23rd

Street, Sheboygan, Wisconsin, in front of the Sheboygan Police Department.

34.     At approximately 5:13 p.m., UC SA 726 and Glazunov met at the above

location.  Glazunov arrived in a grey BMW automobile with Robert Richardson in the

passenger seat.  UC SA 726 approached the trunk of the BMW where he met with

Glazunov and Richardson.  Glazunov removed the Smith & Wesson, Model M&P 15-22,

.22 caliber rifle, camouflage finish, displaying serial number DER6104 from the trunk of

the vehicle.  In exchange, UC SA 726 provided Glazunov four hundred fifty dollars

($450.00) in pre-recorded government funds.  After Glazunov received the money,

Glazunov provided to UC SA 726 the Smith & Wesson rifle, Model: M&P 15-22, bearing

serial number DER6104, three magazines for the rifle, an unknown amount of .22 caliber

ammunition and a cardboard gun box.  Glazunov completed a bill of sale for the rifle.

Glazunov and UC SA 726 signed the documents, and Richardson signed as a witness.

A copy of the document was provided to UC SA 726 and Glazunov took another copy

of the document for his own records.  During this encounter, Glazunov explained to UC

SA 726 that he was not a United States citizen.

35.     UC SA 726 inquired about the suppressors mentioned above to which

Glazunov replied, "No, we were talking about the soda can suppressor yesterday but

we didn't get to it yet, but we want to."

36.     UC SA 726 observed Richardson and Glazunov wearing patches

indicating membership in a militia group.  During the course of the transaction,

Glazunov extended UC SA 726 the opportunity to join Glazunov's militia.  Richardson

added that UC SA 726's membership would have to be cleared by the other members of

the militia before UC SA 726 could join.

37.     Your affiant has completed the ATF Interstate Nexus training.  In

particular, affiant visited the Smith & Wesson factory in Springfield, Massachusetts, and

knows from information provided by Smith & Wesson that this firearm was not

manufactured in Wisconsin.  Subsequently, the firearm traveled in interstate commerce

for it to be present for the above transaction.

## FACEBOOK INFORMATION GENERALLY

38.     Facebook owns and operates a free-access social networking website of

the same name that can be accessed at http://www.facebook.com.  Facebook allows its

users to establish accounts with Facebook, and users can then use their accounts to

share written news, photographs, videos, and other information with other Facebook

users, and sometimes with the general public.

15

39.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

40.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

41.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create

"lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

42.    Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

43.    Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos

17

uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

44.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

45.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

46.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

47.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

18

48.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

49.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

50.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a personalized message can be attached to each gift.  Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

51.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

52.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

19

53.     Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

54.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

55.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For

example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

56.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

57.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For

21

example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

22

58.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## IV. <u>INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED</u>

59.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## V. <u>CONCLUSION</u>

60.     Based on the foregoing, I request that the Court issue the prosed search warrant.

61.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court of the Eastern District of WISCONSIN is a district court of the United States that has jurisdiction over the offense(s) being investigated, 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

23

## <u>ATTACHMENT A</u>

**Property to Be Searched:**

    a.   Information between June 23, 2017, and the present date associated with
the following Facebook page: Facebook page listing username with
Facebook Username "Calvin Glazunov," URL:
https://www.facebook.com/kalvin.glazunov, Facebook User ID:
100008149452383;

    b.   Facebook Username "Calvin D. Glazunov," Facebook User ID Number:
100008712457374, URL:
https://www.facebook.com/profile.php?id=100008712457374.

1

## ATTACHMENT B

**Particular Things to be Seized:**

**I.      Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the
possession, custody, or control of Facebook, including any messages, records,
files, logs, or information that have been deleted but are still available to
Facebook, or have been preserved pursuant to a request made under 18 U.S.C. §
2703(f), Facebook is required to disclose the following information to the
government for each user ID listed in Attachment A:

a.      All contact and personal identifying information, including: full name,
user identification number, birth date, gender, contact e-mail addresses,
Facebook passwords, Facebook security questions and answers, physical
address (including city, state, and zip code), telephone numbers, screen
names, websites, and other personal identifiers.

b.      All activity logs for the account and all other documents showing the
user's posts and other Facebook activities;

c.      All photos uploaded by that user ID and all photos uploaded by any user
that have that user tagged in them;

d.      All profile information; News Feed information; status updates; links to
videos, photographs, articles, and other items; Notes; Wall postings;
friend lists, including the friends' Facebook user identification numbers;

2

groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e. All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

f. All "check ins" and other location information;

g. All IP logs, including all records of the IP addresses that logged into the account;

h. All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked;"

i. All information about the Facebook pages that the account is or was a "fan" of;

j. All past and present lists of friends created by the account;

k. All records of Facebook searches performed by the account;

l. All information about the user's access and use of Facebook Marketplace;

m. The types of service utilized by the user;

3

n.   The length of service (including start date) and the means and source of
     any payments associated with the service (including any credit card or
     bank account number);

o.   All privacy settings and other account settings, including privacy settings
     for individual Facebook posts and activities, and all records showing
     which Facebook users have been blocked by the account;

p.   All records pertaining to communications between Facebook and any
     person regarding the user or the user's Facebook account, including
     contacts with support services and records of actions taken.

**II.   Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and
instrumentalities of violations of 18 U.S.C. Section 922(g)(5) (possession of firearm by a
prohibited person, illegal alien) and 26 U.S.C. Section 5861(f) (making a firearm in
violation of NFA –silencer) since June 23, 2017 until the present, for each user ID
identified on Attachment A, information pertaining to the following matters:

(a) The relevant offense conduct, any preparatory steps taken in furtherance
    of the scheme, communications between the suspect and others related to
    the relevant offense conduct in the above-listed crimes;

(b) Evidence indicating how and when the Facebook account was accessed or
    used, to determine the chronological and geographic context of account

4

access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(e) The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of the above-listed crimes, including records that help reveal their whereabouts.

(f) Based on the forgoing, I request that the Court issue the proposed search warrant based on the aforementioned facts.

5